## The People *vs.* Leonard Simons and Eber Wheaton. *Libel.*

*Maxwell, District Attorney ; Price and Codwise, Counsel for the prosecution. Anthon, Bogardus, and Rodgers, Counsel for the defendants.*

The defendants were charged with writing and publishing an advertisement,* in a paper called the New-York American, on the 20th day of March, 1823, reflecting

NEW-YORK,
May, 1823.
The People,
vs.
Leon. Simons
and
E. Wheaton.

upon the conduct of Gordon and Wallach. They were also charged with writing and publishing a song,† on the 21st day of March, 1823, reflecting also upon the reputation of Gordon and Wallach.

A number of facts were set forth in the indictment, by way of inducement, viz. that the prosecutor and Samuel Wallach were pedlars, and had jointly purchased of Stephen Reed, and Hemstead and Chandler, a quantity of jewelry ; and that Gordon had travleled into and through the western states for the purpose of vending the said jewelry, and was robbed ; that he returned in consequence of the robbery, and was obliged, with his partner, Wallach, to take the benefit of the acts of insolvency : and that they compromised with their creditors for five shillings in the pound, and applied and took the benefit of the act, in Putnam County ; that afterwards Gordon manufactured segars at the corner of Mott and Pump-streets ; that Wallach kept a grocery store at 161 Chatham-street, where a quantity of the segars were vended ; and that Gordon took an oath and made a complaint before the Mayor, touching the license of Simons and Wheaton, and that the prosecutor and Wheaton were Jews.

The advertisement and song set out in the indictment were as follows : " And the jurors aforesaid, upon their " oath aforesaid, do present : that the said Leonard Si- " mons, late of the fourth ward in the city of New-York, " aforesaid, laborer, and one Eber Wheaton, also late of " the same fourth ward of the city and county of New- " York aforesaid, laborer, being, severally, persons of evil, " wicked, and malicious minds and dispositions, and un- " lawfully, wickedly, and maliciously, devising, contriv- " ing, and intending, severally, to scandalize, vilify, and

" defame the said Leonard Gordon, and to bring him in-
" to public scandal, infamy, contempt, ridicule, and dis-
" grace, and to disturb, molest, disquiet, injure, and ag-
" grieve him the said Leonard Gordon, on the 20th day
" of March, in the year of our Lord one thousand eight
" hundred and twenty-three, with force and arms, at the
" city of New York, in the county of New York, afore-
" said, unlawfully and maliciously, did, severally, com-
" pose, print, and publish, and cause to be composed,
" printed and published, in a certain public Newspaper
" called the "New York American," a certain false, scan-
" dalous, malicious and defamatory libel, of and concern-
" ing the said Leonard Gordon, in the form of an adver-
" tisement, of the tenor and effect following, that is to
" say :*" To hawkers and peddlers." For sale, a large and

NEW-YORK,
May, 1823

The People
vs.
Leon. Simon
and
E. Wheaton.

## "TO HAWKERS AND PEDDLERS."

For sale, a large and extensive assortment of jewelry saved from the wreck of the sloop "Insolvency," and imported to this city about four years ago from Putnam Corner Westchester. Among which are about $9000 worth of gold chains, seals, and keys, musical snuff boxes, elegant pearl breast-pins, gold finger-rings set with stones, and other articles too tedious to mention ; formerly purchased of Stephen Reed, Maiden-lane. Also, an extensive assortment of gold and silver thimbles, pencil-cases, &c., purchased of the late firm of Hempstead & Chandler. The above articles have properties peculiar to themselves' and which render them particularly valuable to peddlers who go into the western states' viz., the owner may be robbed of them and still retain possession ; and as they have cost me nothing but a few hard oaths, which I care little about, I offer them cheap for old silver, or in exchange for old horses, suitable for Cavalry.

Also, a large and showy assortment of "Real Havana" segars, imported weekly in large boxes, marked (S ⋈ W,) from the corner of Mott and Pump-streets. And last of all, though not least, two large wooden Jews' Harps, with leather or elastic tongues, particularly useful to gentlemen in the grocery business. These Jews' Harps possess the advantage of scandalizing our neighbors or competitors in business ; and yet of playing their notes so slily and harmoniously, that when sworn to by the friend of the owner, even persons in authority will for a moment be deceived by their syren tones

The above articles are all of the best quality, and will be warranted against all seizure, as being stolen property pawned without license ; and, as I feel great sorrow for my neighbors whom I have myself maliciously involved in difficulty, I think the citizens of New York, and particularly those in the vicinity of Chatham-street, are in duty bound to come

NEW-YORK,
May, 1823.

The People
vs.
Leon. Simons
and
E. Wheaton.

"extensive assortment of jewelry, &c., saved from the "wreck of the Sloop "Insolvency," and imported to this "city about four years ago from Putman Corner, West- "chester; among which are about $9000 (meaning nine "thousand dollars) worth of gold chains, seals, and keys, "musical snuff-boxes, elegant pearl breast-pins, gold fin- "ger-rings set with stones, and other articles, too tedious "to mention; formerly purchased of Stephen Reed, Mai- "den-Lane, (meaning the goods purchased by the said "Leonard Gordon and Samuel Wallach from the said "Stephen Reed, as aforesaid.) Also, an extensive assort- "ment of gold and silver thimbles, pencil cases, &c., pur- "chased of the late firm of Hempstead and Chandler, "(meaning the goods purchased by the said Leonard "Gordon and Samuel Wallach from the said late firm of "Hempstead and Chandler, as aforesaid.) The above "articles (meaning the said goods so purchased from "Stephen Reed, and Hempstead, and Chandler, as afore- "said) have properties peculiar to themselves, and which "render them particularly valuable to peddlers who go into "the western states; viz. the owner may be "robbed" of "them, and still retain them in his possession—and as "they have cost me (meaning the said Leonard Gordon) "nothing but a few hard "oaths," which I (meaning the "said Leonard Gordon) care little about, I (meaning the "said Leonard Gordon) offer them cheap for old silver, "or in exchange for old horses suitable for "cavalry." "(meaning and intending thereby to insinuate and charge "that the said Leonard Gordon had not, in fact, been

and purchase; but if they should think and do otherwise, I know my own remedy; those to whom I am indebted in the sum of $28,000, must take five shillings in the pound, or I will again go up to Putman Corner. Apply to the subscriber, 163 Chatham street, near the corner.                                              L. SIMONS.

New York, March 20th, 1853.

NEW-YORK,
M ιy, 1823.

The People
vs.
Leon. Simons
and
E. Wheaton.

" robbed as stated to him by his creditors, but had un-
" der a false and fraudulent representation to induce
" them to compromise as aforesaid, fraudulently con-
" cealed his property from his creditors, and had but little
" regard for his obligation of an oath.) Also, a large and
" " showy " assortment of " real Havana " segars, import-
" ed weekly in large boxes, Marked (S ⋈ W,) from the
" corner of Mott and Pump-streets. And last of all, though
" not least, two large wooden " Jews harps," with leather
" or elastic tongues, particularly useful for gentlemen in
" the grocery business. These Jews' harps possess the
" advantage of scandalizing our neighbors or competitors
" in business ; and yet, of playing their notes so slily and
" harmoniously, that, when sworn to by the friend of the
" owner, even persons in authority will, for a moment, be
" deceived by their syren tones, (meaning and intending
" thereby to insinuate, represent, and charge, that the said
" Leonard Gordon, in his said examination before the
" Mayor of the city of New York, had sworn falsely, and
" deceived the said Mayor, and had scandalized his neigh-
" bors.) The above articles are all of the best quality,
" and will be warranted against all seizure, as being sto-
" len property, pawned without license ; and, as I (the
" said Leonard Gordon meaning) feel great " sorrow " for
" my neighbors, (meaning the neighbors of the said
" Leonard Gordon,) whom I (the said Leonard Gordon
" meaning) have myself maliciously involved in difficulty,
" I (the said Leonard Gordon meaning) think the citizens
" of New York, and particularly those in the vicinity of
" Chatham-street, are in duty bound to come and pur-
" chase ; but if they should think and do otherwise, I
" (the said Leonard Gordon meaning) know my own rem-
" edy ; those to whom I (the said Leonard Gordon

NEW-YORK,
May, 1823.

The People
vs.
Leon. Simons
and
E. Wheaten.

" meaning) am indebted in the sum of $28,000, (twenty-
" eight thousand dollars meaning,) must take five shillings
" on the pound, or I (the said Leonard Gordon meaning)
" will again go up to Putnam Corner, (meaning the coun-
" ty of Putnam aforesaid.)    Apply to the subscriber, No.
" 163 Chatham-street, near the corner, L. Simons, (mean-
" ing and intending thereby to insinuate and charge that
" the said Leonard Gordon had received stolen goods in
" pawn without license, and was hypocritical and mali-
" cious, and indebted to sundry persons in the sum of
" twenty.eight thousand dollars ; and unless his creditors
" would accept a compromise of five shillings on the
" pound of their respective debts, would again go into
" Putnam County aforesaid, and apply for a discharge
" from his debt under some of the insolvent laws of this
" state,)tothe great damage,scandal, infamy, disgrace, &c.

" And the jurors aforesaid, upon their oath aforesaid,
" do further present that the said Leonard Simons and
" Eber Wheaton, maliciously and wickedly, contriving
" and intending. severally, to scandalize, vilify, and de-
" fame the said Leonard Gordon, and bring him into pub-
" lic contempt, ridicule, infamy and disgrace, and to dis-
" turb, molest, and disquiet him the said Leonard Gor-
" don, on the twentieth day of March, in the year of our
" Lord one thousand eight hundred and twenty-three, with
" force and arms, at the city of New York, in the county
" of New York aforesaid, wickedly, maliciously, and un-
" lawfully, did, severally, compose, print, and publish, and
" caused to be composed, printed, and published, of and
" concerning the said Leonard Gordon, a certain other
" false, scandalous, malicious, and defamatory libel, of the
" tenor following, to wit., Song, " Let the galled jade

" wince."—*Dey call me (the said Leonard Gordon mean-
" ing) Mose Shylock, cause I (the said Leonard Gor-
" don meaning) livsh in de street, vere I (the said
" Leonard Gordon meaning) play de honest man mit
" every vun I (the said Leonard Gordon meaning)
" meet ; and ash dey say I (the said Leonard Gor-
" don meaning) keep vun shtore, I (the said Leonard
" Gordon meaning) say 'tis vun dam lie, I (the said
" Leonard Gordon meaning) *dont* keep *no* shtore at all,
" de goods I (the said Leonard Gordon meaning) only
" puy—mit my (meaning his the said Leonard Gordon's)
" finger-rings and oder tings, snuff boxes, watch chains,
' and watch strings.    I (the said Leonard Gordon mean-
" ing) pought vun lot of jewels, (meaning the jewelry
" purchased by the said Leonard Gordon and Samuel
" Wallach, from the said Stephen Reed, as aforesaid) twash
" some time ago, " de horses eat dem jewels up," I (the
" said Leonard Gordon meaning) tell de cred'tor so ; and
" dem dat vont pelieve me, (the said Leonard Gordon
" meaning) and say I (the said Leonard Gordon mean-
" ing) tell vun lie, vy dem I (the said Leonard Gordon
" meaning) cannot understand, I (the said Leonard Gor-
" don meaning) pass dere language py—mit my (mean-

NEW YORK,
May, 1823.

The People
*vs.*
Leon. Simons
and
E. Wheaton.

SONG.
*"Let the galled jade wince."*

*Dey call me Mose Shylock, cause I livsh in the street,
Vere I play de honest man mit every vun I meet ;
And ash dey say I keep vun shtore I say 'tis one dam lie,
I dont keep no shtore at all, de goods I only puy.
      Mit my finger-rings and oder things,
      Snuff boxes, watch chains, and watch strings.

I pough vun lot of jewels, twash some time ago,
" De horses eat dem jewels up," I tell de cred'tor so ;
And dem dat vont pelieve me, and say I tell vun lie,
Vy dem I cannot understand, I pass dere language py.
      Mit my finger-rings, &c.

Dey call for the witness, against christians ; I don shwear;
Vat ish good for mine own self ; vat ish not I cannot hear ;
De ting vats for my interest, I know always all apout,
Don I shwear dat plack'ish vite, a whale ish vun shmall trout.
      Mit my finger-rings, &c.

NEW-YORK,
May, 1823.

The People
vs.
Leon. Simons
and
E. Wheaton.

"ing his the said Leonard Gordon's) finger-rings, &c. " Dey call me (the said Leonard Gordon meaning) for " de vitness, against christians ; I (the said Leonard Gor- " don meaning) den shwear, vat ish good for mine own " meaning his, the said Leonard Gordon's) self ; vat ish " not, I (the said Leonard Gordon meaning) cannot hear; " de ting vats for my (meaning his the said Leonard Gor- " don's) interest, I (the said Leonard Gordon meaning) " know always all apout, den I (the said Leonard Gordon " meaning) shwear dat plack ish vite, a whale ish vun " shmall trout—mit my (meaning the said Leonard Gor- " don's) finger-rings, &c., &c.  Which said last mentioned " scandalous and defamatory libel, they the said Leonard " Simons and Eber Wheaton, afterwards, to wit. on the " same day and year last aforesaid, at the city and coun- " ty of New York aforesaid, wickedly, maliciously, and " unlawfully, did severally, distribute and deliver, and " cause to be distributed and delivered, to and amongst " divers citizens of this state ; and did, severally, with loud " voices, and in a public, open, and ludicrous manner, " in the presence and hearing of divers citizens of this " state and other persons, speak, sing, utter, publish, re- " cite, and pronounce, and cause to be spoken, sung, ut- " tered, published, recited, and pronounced, to the great " damage." &c.

The advertisement and song was said to be in answer to an advertisement which appeared in the paper the day before, in the following words :—

## "TO SPORTSMEN."

" For sale or to be exchanged for night-caps, a baga- " telle table, a few sets of old dominoes, two packs second " hand playing cards very much used since the first of " May last ; two night lamps. a few representations of the

" planet Veuus—and, finally, *the effects of proof positive,*
" in French.    Apply in Chatham-street, near the square,
" to.                    SAMUEL WALLACH."

NEW YORK,
May, 1823.

The People,
*vs.*
Leon. Simons
and
E. Wheaton.

The counsel for the prosecution, proved by the testimony of John W. Palmer, that on the 20th of March, 1823, Wheaton brought to the office of the American, the advertisement set out in the indictment, and that he had called the next day upon Wheaton at the request of one of the counsel of Gordon in relation to it, and received assurances from him, that he was the author, and would take the responsibility of it upon himself; and that Wheaton, at the same time, recited the whole or part of the song set forth in the indictment.

*Maxwell,* in order to identify the song, was about handing it to the witness, and proposed to inquire of him, whether the song Wheaton recited to him was the one now produced.  The counsel for the defendant objected to this course, and contended the witness ought to repeat the words of the song recited to him by Wheaton, and not by reading the printed song ascertain whether it was the same as that recited.

The Court decided that the printed song might be handed to the prisoner; that in most cases it would be impossible for any person to recollect the words of a trifling song repeated to him some weeks before and permitted the song to be handed to the witness.   He testified that it was the same song recited to him by Wheaton.

It appeared that the song had been written by one Ely, and a number had been left in Simons and Wheaton's store ; and that Wheaton has read it to several, but that Simons had no agency in either the advertisement or the

NEW XORK,    song; except so far as handing one of the latter to a
May, 1823.   neighbor who had requested one.    The counsel for the
The People   prosecution, after proving the allegations and inuendoes
   vs
Leon, Simons set forth in the indictment, rested the case.
  and
E. Wheaton.      *Anthon* contended that as this was a joint prosecution,
             it could not be sustained, where it appeared by the evi-
             dence, one of the parties was not implicated, and referred
             to 2 Burr, 985, 986.    And that the jury ought to be in-
             structed to find a verdict for Simons, and he made a wit-
             ness for Wheaton, to the other defendant.

   Criminal      The Court observed that criminal prosecutions were
prosecutions
are *joint and* joint and several in their nature, except those of riots and
*several,*    conspiracies, which were joint; that the evidence against
             Simons was, that he had handed one of the songs to a
             neighbor; this was sufficient to carry his case to the jury
             and put him upon his defence.

             The counsel for the defendants then went into a justifi-
             cation, they called witnesses to prove that the facts charged
             as libelous were true.

             *It appeared by the testimony of Mr. Reed, that Gordon
             and Wallach had purchased of him between eight and
             nine thousand dollars' worth of jewelry on credit, and that
             Gordon travelled into the western country for the pur-
             pose of vending it, and had returned with a story. that
             he was robbed under singular circumstances; that he had
             written a letter to a gentleman in the western country, and
             had received an answer that the robbery was never heard
             of there.   And for the purpose of showing the fraudulent
             transactions of these men, it was proved that they arrived
             in this country from England some time in the year 1812,

in insolvent circumstances; that the had suddenly grown NEW YORK, rich, and had made all their property over to Thomas May, 1823. Hudson and Thomas Moffat, two foreigners, to the amount The People of $21,212; that the application of Gordon and Wallach *vs.* Leon. Simons to Judge Garrison of Putnam County, for relief, under the and E. Wheaton. insolvent law, was clearly fraudulent; they had never paid Mr. Reed one cent of his large and just demand against them; that their subsequent conduct was full of suspicion, they enter immediately after their discharge into trade, Wallach has a full store, and Gordon an extensive segar manufactory. Large quantities of jewelry are found in their possession, ascertained to be some of that stock purchased of Mr. Read. That the facts charged as being libellous in relation to the segars, were true, counterfeit marks and labels had been put upon the boxes, and sold as Spanish segars.*

*Anthon* contended they had made out a complete justification—all the charges and insinuations in the matter charged to be libellous, were proved to be true. That a more shameful and barefaced system of fraud had never been practised and exposed in a Court of Justice than that proved upon Gordon and Wallach. That the former severity of the law in relation to libel had passed away.— The greater the truth, the greater the libel, was a principle long since exploded, not only in this country, but also in England. That the greatest latitude had been given to discussion by the article of our Constitution; and a person now might freely and securely write and speak truth with good motives and justifiable ends. It was the duty of the defendants, he contended, to expose the frauds of Gordon and Wallach.

*See a full and accurate report of the evidence, by Mr. Rodgers. Pamphlet.

NEW-YORK,
May, 1823.

The People
*vs.*
Leon Simons
and
E. Wheaton.

*Price*, in reply, observed, the gentleman who preceded me, has justly told you that the rigid rule of law formerly adopted in the English Courts, and our own, that the greater the truth, the greater the libel, was now exploded; and that the truth might be given in evidence.— But he has not dealt fairly with you, he should have told you, that in some cases of libel even the truth of the matter would be no justification; for the act, the principles of which are engrafted in your new Constitution, requires, that it should further be made satisfactorily to appear that the publication was made with good motives, and for justifiable ends. Could it be endured for a moment, that the personal defects or infirmities of an individual should be made the subject of newspaper animadversion? That because a man had been so unfortunate as to lose an eye, or an arm, that he should be held up to the public as an object of scorn and reproach? The publication might be true; but it could not possibly be made with good motives, and for justifiable ends. So if one of your fellow citizens is reduced by misfortunes to the necessity of applying for the benefit of the insolvent act, shall he be exhibited in a censorious and ridiculous point of view? The gentleman contended that these defendants stand justified, because Gordon was the aggressor; and that because he made the first publication, they had a right to libel him. Are you willing that it should be established as the settled law in a community where law prevails, that one man has a right to commit an assault and battery on his neighbor, because his neighbor had committed the same offence on him? Your good sense, I am convinced, revolts at a doctrine so preposterous—a doctrine fraught with so much evil. If you acquit these defendants of these libels, you ruin the character of the prosecutor forever, his neigh-

bors may make and reiterate, over and over again, the
scandalous and malicious charges contained in the publi-
cations, with impunity. Is it not cruel in the extreme, thus
to put this prosecutor, who is a stranger among us, on his
trial for an offence so serious.

New-York,
May, 1823.

The People,
vs.
Leon. Simons
and
E. Wheaton.

Here it is said, that we have not examined him as to the
robbery; and therefore, it is to be presumed that it never
took place. And, yet the gentlemen themselves produced
before us his affidavit and inventory, from Putnam, con-
taining a particular account of this robbery. Who has in-
formed you, and who dares, under oath, inform you, that
the affidavit if false? I put the question to Mr. Reed, dis-
tinctly, whether he would undertake to swear positively,
that Gordon was not robbed; and his answer was, that he
could swear to no such thing. The oath of Gordon,
therefore, stands uncontradicted. The main charge
against him in these publications is, that he is guilty of
fraud and perjury; and if you think that he is guilty, you
ought to pronounce a verdict for the defendants; but if
not, it is your duty to convict them. But I beg of you,
gentlemen, to make his case your own. He is a stranger;
and though he may not be a member of the same church
to which either of you may belong, though he may be-
long to a religious sect, which in times past, bigotry and
intolerence have proscribed, yet, in this enlightened age,
and under your new Constitution, no difference is made
between Jew and Gentile. The law equally secures the
rights of all, and affords to every citizen equal protec-
tion. And when an individual is thus placed before you,
it is his right to demand, and it is the boast of our civil
and political institutions, that he shall receive, the same
protection, and the same favor, as if he was a member of

NEW-YORK, the same church, or society to which you belong. I im-
May, 1823. plore you, on this occasion, to interpose in favor of a
The People stranger in our country, and ask you not only to protect
_vs._
Leon. Simons him, but by your verdict, to teach these defendants that
and they cannot violate the law of the land with impunity.
E. Wheaton.

*Riker, Recorder,* after recapitulating the testimony,
stated that the evidence against Simons was insufficient,
and that it would be their duty to acquit him—observed
that the question for the jury to try, was whether the other
defendant, Eber Wheaton, was guilty of publishing a libel,
as set forth in the indictment. It was satisfactorily proved
that Wheaton carried the advertisement to the office of
the New York American, and paid for its insertion in that
paper, he was, therefore, both the writer and the publish-
er. It was also proved that he recited the song to Mr.
Palmer, and others ; and a publication of it is therefore
fully made out. If, therefore, the advertisement and the
song be libellous, he is guilty.

It has been contended, by the counsel for the defendants,
that as Gordon published a scurrilous advertisement
against Simons, that it afforded a justification to the pub-
lication, to the advertisement and song made in answer ;
and in support of this position, Pasquin's case, decided be-
fore Ld. Kenyon had been referred to. That case was
an action for damages, and had but little application to
the case now before the Court. The rule formerly
adopted in relation to libels, both in this country and in
England, was, that the greater the truth, the greater the
libel ; but, by a declaratory act of the Legislature, it
is enacted " that in every prosecution for writing or
" publishing any libel, it shall be lawful for the defendant
" upon the trial of the cause, to give in evidence, in his

"defence, the truth of the matter contained in the publica-
"tion charged as libellous; provided, always, that such
"evidence shall not be a justification, unless on the trial
"it shall be made satisfactorily to appear, that the matter
"charged as libellous, was published with good motives,
"and for justifiable ends." Rev. L. vol. 2, p. 554.

NEW-YORK,
May, 1823.

The People
vs.
Leon Simons
and
E. Wheaton.

His Honor also adverted to the new Constitution, which declares that in "all prosecutions, or indictments for a "libel, the truth may be given in evidence to the jury; "and it shall appear to the jury that the matter charg-"ed to be libellous is true, and was published with good "motives and for justifiable ends, the party shall be ac-"quitted; and the jury shall have the right to determine "both the law and the fact." See Cons. art. 7. p. 19; and observed that it was a salutary law and wholesome regulation of the press, every man might now publish truth with good motives and for justifiable ends, and whether the matter charged was libellous or not, was now the undisputed province of the jury to determine. It was not, however, sufficient that the matter charged as libellous was true, it must be made with good motives and for justifiable ends. Some people were deformed in body, and defective in mind. Could it be tolerated, that these imperfections might be published to the world, and the libeller defend himself by a plea that it was not done with good motives and for justifiable ends? And in the case put by the counsel for the prosecution, as mankind were subject to accident and misfortune, suppose they should lose an eye or an arm, can it be permitted that his infirmities may be published, and himself held up to scorn and reproach, and a defence set up that it was done with good motives and for justifiable ends? In each of these cases,

NEW-YORK, the facts might be true, but it is obvious they could not be
May, 1823. made with good motives.    The only effect such publica-
The People  tions could have, would be to inflame the passions and
*vs.*       provoke breaches of the peace.    Many persons were un_
Leon. Simons
and       fortunate in business, and had recourse to the insolvent
E. Wheaton. laws for relief.    It is not to be expected that others may
publish and hold them up as objects of reproach to the
world.   No such publications can come within the mean-
ing of a publication with good motives and for justifiable
ends.   There are some subjects the world have no busi-
ness with ; whether the publication of them, therefore, are
true or not, cannot avail the prisoner, because they ought
not to be published at all ; and concluded by observing that
it would rest with the jury, after a dispassionate considera-
tion of all the circumstances in the case, to determine, in
the first place, how far the matter charged in the publica-
tion are shown to be true ; and in the next place whether
it was made with good motives and for justifiable ends;
that the jurors in this case are peculiarly the judges of the
law, as well as of the fact ; and if they should believe that
publication was made with good motives and for justifia-
ble ends, it would be their duty to acquit.

The jury returned a verdict of not guilty for each of the
defendants.

*Note.—A libel is defined to be a malicious defamation, either by print-
ing, writing, signs, or pictures tending to blacken the memory of
one who is dead, or the reputation of one who is alive, and expose
him to hatred, contempt, or ridicule.   Hawk. P. C. vol. 1, p. 352.

Or, as defined by Hamilton, in Croswell's case.  3 Johns. Cases, vol. 3,
p. 254.   A libel is a censorious or ridiculing writing, picture, or sign,
made with a mischievous and malicious intent towards government,
magistrates, or individuals.   Johnson's Cases, vol. 3, p. 354.   The

latter definition seems to be adopted in this country. Yates's Rep. vol. 4. 269.

NEW-YORK, May, 1823.

The People vs. Leon. Simons and E. Wheaton.

The most common mode of libelling another is by means of censorious or ridiculing writing; but may nevertheless be by the exhibition of a picture or sign, which, reduced to writing, would be libellous. 2 Campb. 512. Hawk. b. 1. c. 73, § 2. 11 East. 227. City Hall Recorder.

1. A libel must be a censorious or ridiculing writing, picture, or sign.

Every species of censorious or ridiculing writing cannot, perhaps, be compressed within a reasonable description. It depends upon time, manner, and also the intent of the writer and publisher. In the language of the great man above referred to, texts taken from the holy Scriptures, and scattered among the people, may in certain times, and under certain circumstances, become libellous. Johns. Cases, vol. 3, p. 254.

Against government.

In this country, every man may publish temperate investigations of the nature and forms of government, such matters are proper for public information; but if such publication is seditiously, maliciously, and wilfully aimed at the independance of the United States, or the constitution thereof, or of any other State, the publisher would be guilty of a libel. Yates' Rep. vol. 4. p. 270, 271. 2 Campb. 402. But care must be taken that this important privilege be not abused; private character must not be wantonly assailed; even "if one uses the wea-" pons of truth wantonly, for disturbing the peace of families, he is "guilty of a libel." Johns. Cases, vol. 2, p. 70. Yates' Rep. vol. 4, p. 269.

It has always been a favorite privilege of the American citizen, to investigate the tendency of public measures, and the character and conduct of public men. This right is guaranteed to us by the constitution, and is inherent, from the nature of the government itself. Every man having a direct and immediate interest in the government, either personally or by representation, has an undoubted right to point out abuses, and correct the errors in it. This privilege is too valuable to be surrendered, and too obvious ever to be disputed.

This right, like every other, may be abused, and often is abused. *The*

NEW-YORK,
May, 1823.

The People
*vs.*
Leon. Simons
and
E. Wheaton.

*liberty of the press consists in publishing, with impunity, truth with good motives, and for justifiable ends, whether it relates to men or measures.* Johns. Cases, vol. 3. p. 354. Invective and contumely can never effect a good object, or prevent the occurrence of a bad one. The State and Constitution is the common inheritance of all; every attack upon them which affects their security and permanency, is a positive injury to the rights of every individual in the State, and ought to be punished. When force is coupled, with an intention to subvert and destroy the Constitution and the laws, it becomes the highest crime known, and is uniformerly punished with death. And it would be a strange perversion of criminal justice, if the State Constitution and government might be robbed of the love and veneration of the people, by wanton and calumnious libels, with impunity.

It has been judiciously observed by Holt, in his Law of Libels, that "defamation of this kind is more dangerous, inasmuch as it appeals "to the passions rather than to the reason of the multitude; it unset- "tles the minds of the people, relaxes the authority of the rulers, and "impairs the reverence due to the laws." Lord Mansfield observed: "To be free, is to live under a government of law. The liberty of "the press consists in printing without any previous license, subject "to the consequences of law. The licentiousness of the press is Pan- "dora's box, the source of every evil. Miserable is the condition of "individuals, dangerous is the condition of the State, if there is no "certain law, or, which is the same thing, no certain administration "of law, to protect individuals or to guard the State." Lord Raym. "418. See also 3 T. Rep. 428. 2 Wills. 275.

Every officer, civil, judicial, and military, in this country, may be approached, and his official acts scrutinized into, and commented upon, and their tendency and utility ascertained and exposed; but it can never be tolerated that men should, by malicious and intemperate investigation, and dangerous speculation, put in jeopardy the fundamental principles of the Constitution He must not shake what is rooted, nor bring again into discussion, with a view of disturbing what is settled, he may impute, and suggest improvement; he may present a me-

morial, or statement, or a remonstrance, but he must not provoke the passions of the populace, or overawe the laws. Holt's Law of Libel, p. 96. All libels, therefore, which tend to degrade and vilify the con-The People stitution, that tend to foment dissatisfaction and sedition, to alienate vs. the affection of the people from the constitution and laws, to asperse Leon. Simons and and vilify courts of justice, and to bring their proceeding into con-E. Wheaton. tempt, have always been visited with a rigorous punishment. 3 Inst. 174. Ventr. 324, 325. 2 Stra. 789. 11 Mod. 86.

On the trial of Joseph Dennie, for a libel against the government of the United States, at Philadelphia, 1805, Yeates, Justice, spoke as follows.
" It is no infraction of the law to publish temperate investigations of
" the nature and forms of government. The day is long past, since
" Algernon Sidney's celebrated treatise on government, cited on his
" trial, was considered as a treasonable libel. The enlightened ad-
" vocates of representative republican government pride themselves
" in the reflection, that the more deeply their system is examined,
" the more fully will the judgments of honest men be satisfied, that it
" is the most conducive to the safety and happiness of a free peo-
" ple. ' Such matters are proper for public information.' But there
" is a marked and evident distinction between such publications,
" and those which are plainly accompanied with a *criminal intent*,
" deliberately designed to unloosen the social band of union, totally
" to unhinge the minds of the citizens, and to produce popular dis-
" content with the exercise of power by the known constituted au-
" thorities. These latter writings are subversive of all government
" and good order. The liberty of the press consists in publishing
" the truth, from *good motives* and *justifiable ends*, though it reflects on
" government, or on magistrates. It disseminates political knowledge'
" and by adding to the common stock of freedom, gives a just confi-
" dence to every individual. But the malicious publications which
" I have reprobated, infect insidiously the public mind with a subtle
" poison, and produce the most mischievous and alarming conse-
" quences, by their tendency to anarchy, sedition, and civil war.
" We cannot consistently with our official duty, pronounce such con-
" duct dispunishable. We believe that it is not justified by the
" words or meaning of our constitution. It is true, it may not be easy,

NEW-YORK,
May, 1823.

The People
*vs.*
Leon. Simons
and
E. Wheaton.

" in every instance, to draw the exact distinguishing line. To the " jury it particularly belongs, to decide on the *intent* and *object* of " the writing. It is their duty to judge candidly and fairly, leaning " to the favorable side, where the criminal intent is not clearly and " evidently ascertained." Yeates Rep. Vol· 4. p. 270.

Time, place, and manner is, as was before observed, an essential ingredient of libel. It cannot be doubted that the same slander and libellous matter, is far more criminal when applied to those in high and exalted stations—to the President and his immediate officers, than to a petty constable or a tax gatherer. The esteem and veneration paid to officers of exalted station is necessary for the security and permanency of government; any malicious alienation of that esteem and respect obstructs the regular administration of justice, and saps the foundation upon which it is built. 5 Burr. Rep, 2661. And to such an extent was this doctrine carried in the early ages of English history, that words which at this day would hardly be considered as libels, when uttered against the king and his great officers of state were adjudged treason. See the cases Cro. Car. fol. 117, 125.

And it is well remarked by Hawkins, who says, " it is a very great ag- " gravation of a libel that it tends to scandalize the government, by re- " flecting on those who are entrusted with the administration of pub- " lic affairs, which does not only endanger the public peace, as all " other libels do, by stirring up the parties immediately concerned in " it to acts of revenge, but also has a direct tendency to breed in the " people a dislike to their governors, and to incline them to faction " and sedition." Hawk. P. C. c. 73, § 7. See the Cases of the King *v.* Bear, 12 Mod. 221. The King *v.* Lawrence, 12 Mod. 311. The Queen *v.* Bedford, Gilbert's Cases, p. 297. The Queen *v.* Tutchin, St. Tr· vol. 5, p. 527. The King *v.* Franklin, St. Tr. vol. 9, p. 276. The King *v.* Horne, St. Tr. vol. 8.

Legislature. Libels upon the Legislative branch of government have, in most countries been severely punished, not only by courts of law, but have been considered in the nature of breaches of privilege and gross contempts of their power and dignity. See the jurisdiction of the house of commons, by W. W. Wynne, Esq. 1810. See also the following cases : The Earl of Shaftesbury, 1 Mod. 144. Jay· and Tophan, St. Tr

vol. 8. Raymond and White, Lord Raym. vol. 2, p. 938. Alexander
Murray, 1 Wills. 299. Towler, 8 T. Rep. 314. Francis Burdett's
case, 14 East. p. 1. A considerable number of cases, of a similar na-
ture, [have occurred in this country, and may be found upon the     The People
journals of the house of Congress, and legislature of the respective     vs.
States. See William Keteltas' case, Journ. Assemb. of the State of     Leon. Simons
N. York, 1795. George Clark's case, ibid, 1810, Journ. of Senate.     and
See Jefferson's Manuel, Parl. Hrac. sec. 3. and Anderson's case,     E. Wheaton.
Journal of Congress, January, 1818, and Randall and Whitney's case,
Jefferson's Manual, sec. 3.

The proceedings in courts of justice are public ; the public therefore, have     Courts of
a right to hear and see them, and it is undoubtedly within the com-     Justice:
pass of the liberty of the press to discuss, in a decent and temperate
manner, the decisions and judgments of a court of justice ; to suggest
even error, and provided it be done in the language, and with the
views of fair criticism, to censure what is apparently wrong, but with
this limitation, that no false or dishonest motives be assigned to any
party. Holt's Law of Libel, p. 170. It is the constant practice to
publish the proceedings, both in civil and criminal courts ; but any
intemperate reflection upon them, or any of the parties lawfully con-
vened, is libellous. 1 Hawk. b. 1. c. 73, § 8. 1 Campb. p. 359. Sir
Wm. Jones, p. 431. 8 T. Rep. 296. 1 Bos. and Pull. 525. 1 Lord
Raym. 341.

Mr. Justice Grose, in the case of the King v. Hart and White, spoke as
" follows : " It certainly was lawful, with decency and candor, to dis-
" cuss the propriety of the verdict of the jury, or the decisions of a
" judge ; and if the defendants should be thought to have done no
" more in this instance, they would be entitled to an acquittal ; but,
" on the contrary, they had transgressed the law, and ought to be
" convicted, if the extracts from the newspaper, set out in the infor-
" mation, contained no reason or discussion, but only declamation
" and invective, and were written, not with a view to elucidate truth,
" but to injure the character of individuals, and to bring into
" hatred and contempt the administration of justice in the country."
1 Campb. 359.

The statement of the proceedings should be a fair, honest, and impar-

NEW-YORK,
May, 1823.

The People,
vs.
Leon. Simons
and
E. Wheaton.

tial statement, and not a garbled and partial one.  Lord Ellenborough goes much farther : he said, speaking  on this subject, " It often hap-" pens that circumstances necessary, for the sake of public justice, to " be disclosed by a witness in a judicial inquiry, are very distressing " to the feelings of individuals on which they reflect ; and if such " circumstances were *wantonly* published, I should  hesitate to say, " that such unnecessary publication was not libellous, merely be-" cause the matter  had been given in evidence in  a court of justice." 7 East. Rep. p. 503.

It is also libellous to publish preliminary examinations taken *ex parte ;* its tendency being to excite a prejudice in the minds of the jurymen and the community, and consequently to deprive of the important right of a fair trial.  2 Campb. 563 ; and see also Justice Heath's opinion, 5 Esp. Rep. p. 123.

Every person has a right to publish a fair and honest account of the proceedings of courts of justice.  1 Bos. and Pul. p, 525.  But this right has always  been considered with some exceptions.  Where an exposition of proceedings in courts of justice would be injurious to the public interest,  where  it would wound private feeling,  or where  it would shock public decency, there can  be  no doubt  such publication would be considered libellous, in this country.  Mr. Justice Bayley's remarks upon this subject, in the case of the King *v.* Creevey, 1 Maule and Selwyn, p. 280, are  too appropriate  and valuable to be omitted.  He  says, " It has been argued that the proceedings of " Courts of Justice are open to publication—against that as an unqual-" ified  proposition I enter my protest.  Suppose an indictment for " blasphemy, or an indictment where indecent evidence was necessa-" rily introduced, would every one be at liberty to poison the minds " of the public, by circulating that which, for the purpose of justice, " the Court is bound to hear ? I should think not : and it is not true, " therefore, in all instances, that the proceedings of a Court of Jus-" tice may be published.  Again, it may be said, that counsel have a " right, in pursuance of their instructions, and whilst the case is go-" ing on, to endeavor to produce an effect, by making such observa-" tions on the credit and character of parties, and their witnesses,  as " sometimes,  when  the  cause  is  over, perhaps  they are sorry for-

"But have they, therefore, or any other person who hears them, a
"right afterwards to publish these observations ? I have no hesita-
"tion in saying, that when the occasion ceased, the right also would
"cease ; and that it would be no justification to plead, that a publica-
"tion was a transcript of the counsel's speech."

NEW YORK,
May, 1823.

The People
vs.
Leon. Simons
and
E. Wheaton.

In Freer's case, which was an attachment for contempt, for publishing a
paragraph containing some animadversions upon the proceeding in
Croswell's case, which was then pending, Kent, Justice, after enume-
rating a number of circumstances in favor of the prisoner, observed,
"When a case is made out, in which there appears sufficient evidence
"of an intentional contempt, we should deem it our indispensable
"duty to inflict a punishment more strong and exemplary. But we
"trust the notice we take of the present case will answer all the ends
"of justice, by serving as a sufficient warning to the defendant and
"others, not to presume to use language which must be understood
"as reflecting upon, or threatening the Court, with respect to ques-
"tions then under investigation." 1 Caines, 485. 518. See also 1
Dall. 317. 2 Johns. 290. 4 Johns. 317. 6 Johns. 337.

A magistrate being invested with power for the protection and security
of the people, the law will not permit that authority to be insulted
and degraded by any species of defamation whatsoever : the cases
under this branch are numerous, and notwithstanding many of them
were decided in the Star Chamber, they are good law ; the exception
is only to the excessive punishment that appeared to prevail in those
times. See 5 Coke, 125. Hobart, 215. 5 Mod. 167. 9 Coke, 59. See
also the case of the King v. Jeffe, 5 Car. 1639 ; and also the King v.
Staples, And. 228. The Queen v. Cross, 5 Mod. 43. But cannot be
construed a libel, where proceedings are relevant and necessary to
the cause of justice.

Against Mag-
istrates.

The plaintiff brought an action against the defendant, and declared,
amongst other things, "That he being vicar-general to the Bishop of
"Lincoln, the defendant had caused to be printed a petition to parlia-
"ment, charging him with divers crimes; as extortion, oppression,

The People
*vs.*
Leon. Simons
and
E. Wheaton.

" and corruption in his office." The defendant justified the publication, and insisted on the truth of the subject matter of the petition. The action was holden not to lie, the petition being the necessary and usual mode of complaint to parliament for the redress of any grievance. Holt's Law of Libel, p. 184. Lake *v.* King, 1 Saund. 121. (K.) and is recognized in Hawk. P. C. 194. 2 Inst. 228. 2 Burr. 811. 3 Taun. 456. 2 N. Rep. 341. See also Croswell's case, 3. Johns. Cas. 337. Duane's case, 1 Binney, 601. 5 Johns. Rep. 1. 5 Johns. 508. Clapp's case, 4 Mass. Rep. 163.

Against private persons.

To charge a person with committing any act which the law recognizes and punishes as a crime, is libellous, and of the highest species of aggravated libel against a private individual. 4 Rep. p. 15. 2 Bulst. 150. 6 T. R. 691. 4 Esp. Rep. 191. 2 Stra, 898. 2 Burr. 980, 817.

No man has a right to become a judge and executioner in his own cause, as the libeller of his neighbor is ; but he may apply for redress to the proper tribunal, for real or supposed injuries, and state them by petition or otherwise ; and even where the malicious and defamatory intention is evident, and where the tribunal of justice to which he applies is made use of merely as a cloak or cover, he will not be held criminally answerable for a libel. Lev. 240. 1 Hawk. P. C. c. 73 § 8 Moor 627. 5 Johns. 501. But where the prosecution is *entirely false, groundless,* and *malicious,* such mockery of public justice is an aggravation of the crime. Hawk. P. C. c. 73 § 8. 5 Johns. p. 1.

Nor is it libellous for a person who is interested in a fact to make a written inquiry of another, even if that inquiry carries the imputation of a crime, if done with a *bona fide* and with an honest intention. 4 Esp. Rep. p. 191.

Any imputation against a person who is in the enjoyment of an office, either public or private, of honor, profit, or trust, which imports a charge of unfitness to administer the duty of the office, is libellous. Buller's N. P. p. 4.

To write of a man that he is a corrupt judge; of a member of parliament that he is an enemy to the established church; to write of a justice of the peace that he is a debauched man, and not fit to be a justice of the peace; of any person in a public office, that he is a cheat; to write of a commissioner for examining witnesses, that he is a corrupt man; to write of a church warden, that he has cheated the parish; or of a bailiff, or of any servant, who is to account for money received, that he is a cozening knave to the person who employs and confides in him; all these written imputations, from their tendency to produce a breach of the peace, and their manifest private injury, the subjects of indictment.    Holt's Law of Libel, p. 208, 209. Wils. 403. 5 Co. 125, b.  Hob. 215. Poph. 139. 2 T. Rep. 199. 1 Caines', 518.

*NEW-YORK,*
*May, 1823.*

The People,
*vs.*
Leon. Simons
and
E. Wheaton.

Written libels against a person in his profession, or business, are indictable even where an action for the same slanderous words would not lie.  Hawk. P. C. c. 73. § 3.   The King *v.* Lake. A liberal freedom, however, is allowed in discussing character and business in the confidential and necessary intercourse of society.  See 1 Campb. Rep. 267.   The law will regard private confidential communications, even where they are false, and prove injurious to the party; but if the communication is not only false, but also wilful and malicious, private confidence and communication cannot justify that which from its nature is libellous.  2 Stra. 888, 899. Bac. Abr. 491, 492.  A private letter, containing the character of a servant, even where specific acts of fraud is charged, is not libellous unless the letter is malicious as well as false. Ibid.  It was formerly held no writing was a libel unless it reflected upon some individual, but may now be for any immoral publication.  Hawk. b. 1. c. 73. § 9. 2 Stra, 788, 834.

Against their
profession or
business.

The author and his composition are fair subjects of criticism and ridicule. The critic does a service to the public, who write down any vapid or useless publication, such as ought never to have appeared. He checks the dissemination of bad taste, and prevents people wasting both their time and money upon trash. 1 Campb. 355.  We really must not cramp observations upon authors and their works: they should be liable to criticism, to exposure, and even to ridicule, if their composition be ridiculous, says Lord Ellenborough. Ibid.   And the

critic may fairly attack the author himself, so far as he has identified his principles and views with the book he has published ; but if he leaves the book to attack character, and interferes with the private life and reputation of the author, such unlawful interference will be libellous. Ibid.